**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

ANTHONY J. DAQUINO,
    Appellant,

   v.

DEPARTMENT OF VETERANS
  AFFAIRS,
     Agency.

DOCKET NUMBERS
DE-1221-12-0487-W-2
DE-1221-13-0087-W-2

DATE: February 27, 2023

# THIS ORDER IS NONPRECEDENTIAL[1]

Eric L. Pines, Esquire, and Stephen Goldenzweig, Esquire, Houston, Texas,
 for the appellant.

Mark S. Jaffe, Esquire, Albuquerque, New Mexico, for the appellant.

Steven Snortland, Esquire, Los Angeles, California, for the agency.

Deanna Livingston, Albuquerque, New Mexico, for the agency.

### BEFORE

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member
Member Leavitt issues a separate dissenting opinion.

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

## REMAND ORDER

¶1     The appellant has filed a petition for review of the initial decision, which denied his request for corrective action based on alleged whistleblower reprisal. For the reasons discussed below, we GRANT the appellant's petition for review. We AFFIRM the initial decision IN PART, VACATE the initial decision IN PART and REMAND the case to the Board's field office for further adjudication in accordance with this Remand Order.

## BACKGROUND

¶2     At all times relevant to this appeal, the appellant was employed as a nurse in the gastrointestinal (GI) studies section at an agency medical center in Albuquerque, New Mexico. After joining the GI section in 2009, the appellant became concerned about some practices within the section. The appellant initially reported those concerns within his chain of command at the Albuquerque facility, but after receiving what he considered inadequate responses to those complaints, he forwarded his complaints regarding the GI section in Albuquerque to the agency's Chief Nurse Executive. MSPB Docket No. DE-1221-12-0487-W-2, Appeal File (0487W2 AF), Tab 105 at 145-46; January 13, 2014 Hearing Transcript (HT) (1/13/14 HT) at 59-61 (testimony of the appellant).

¶3     In response to the appellant's complaints, the Chief Nurse Executive sent representatives of the Veterans Integrated Service Network (VISN) to Albuquerque. 1/13/14 HT at 65-66 (testimony of the appellant). The appellant's supervisors understood that his complaints were the impetus for the VISN visit. January 14, 2014 HT (1/14/14 HT) at 93 (testimony of the proposing official); January 16, 2014 HT (1/16/14 HT) at 182-83 (testimony of the supervisor). In December 2009, after the VISN visit to Albuquerque, the Chief Nurse Executive sent the appellant a letter informing him that corrective actions would be taken in response to some of his complaints. 0487W2 AF, Tab 105 at 148. The appellant testified that he felt his supervisor began scrutinizing and criticizing his

performance and giving him less favorable work assignments following the VISN visit. 1/13/14 HT at 66-69 (testimony of the appellant).

¶4    In February 2010, in response to an anonymous complaint to the agency's Inspector General (IG), the regional VISN manager requested that the Associate Director of Patient Care from another agency medical center visit the Albuquerque facility to conduct an inquiry. 0487W2 AF, Tab 105 at 151. The appellant was one of more than 50 employees who provided information as part of that inquiry, but the resulting report did not identify the appellant, or any other employee, by name as the source of any particular complaint. *Id.* at 151-65.

¶5    Also in February 2010, the appellant's immediate supervisor observed that he had violated privacy standards by leaving a computer unattended. She testified that she warned the appellant that he would receive a written counseling if he did the same thing again. 1/16/14 HT at 152 (testimony of the supervisor).

¶6    The following month, a coworker of the appellant allegedly overheard a conversation among a group of GI section doctors and the appellant's supervisor. According to the coworker, one of the doctors[2] asked, "Why don't we get rid of him?" The supervisor allegedly responded, "There is a thing called the Whistleblower Act."[3] The coworker reported the incident in writing, 0487W2 AF, Tab 106 at 18, which report the appellant provided to two senior officials at the Albuquerque facility, but no formal investigation of the alleged conversation took place. 1/13/14 HT at 83 (testimony of the appellant); 1/14/14 HT at 10, 78 (testimony of the proposing official); 159 (testimony of the GI section chief). The appellant's union subsequently filed a grievance on his behalf asserting that the agency failed to investigate the incident adequately. 1/13/14 HT at 103 (testimony of the appellant).

---

[2] The coworker did not identify the person who made this statement, and he testified to not knowing whether it was a doctor. 1/13/14 HT at 19 (testimony of the coworker).

[3] The supervisor denies that this conversation ever took place. 1/16/14 HT at 161 (testimony of the supervisor).

¶7  A few weeks after the alleged conversation involving "the Whistleblower Act," the appellant sent an email to the Federal Bureau of Investigation (FBI) titled "Safety Concerns Regarding Middle Eastern Origin MDs at the [New Mexico] VA Hospital in Albuquerque." 0487W2 AF, Tab 106 at 180-81. In the email, the appellant described his history of reporting safety concerns in the GI section before reporting the alleged conversation among the GI section doctors and his supervisor. *Id.* at 180. The appellant then noted that there were at least three GI doctors who were "of Middle Eastern origin," and that one of them was a citizen of Syria (which, he noted, was on the list of state sponsors of terrorism). However, he acknowledged that there was no particular reason to believe any of those three doctors was the person who asked "Why don't we get rid of him?" *Id.* The appellant asked the FBI to investigate who asked that question, what was meant by it, and to whom it referred. *Id.* He indicated that he had struggled with whether to report this matter to the FBI, but explained that "the recent events at Fort Hood and the CIA compound in Afghanistan," both of which were carried out by "Middle East Origin DOCTORS" (capitalization in original)[4] led him to report it. *Id.* at 180-81.

¶8  In March 2010, the supervisor observed that the appellant walked away from a computer to respond quickly to another nurse's call for help, but in doing so he left unsecured a computer containing patient information. The appellant received a written counseling for these actions on April 2, 2010, just over a month after the incident. 0487W2 AF, Tab 104 at 5.

---

[4] "Fort Hood" is an apparent reference to a November 2009 mass shooting carried out in Texas by an Army psychiatrist. *See* History, *Army major kills 13 people in Fort Hood shooting spree*, https://www.history.com/this-day-in-history/army-major-kills-13-people-in-fort-hood-shooting-spree (last visited Feb. 27, 2023). "The CIA compound in Afghanistan" is an apparent reference to a December 2009 suicide bombing carried out by a Jordanian physician. *See* CNN, *Jordanian doctor called double agent behind CIA attack*, http://www.cnn.com/2010/WORLD/meast/01/05/jordan.cia.bombing/index.html (last visited Feb. 27, 2023).

¶9     During a staff meeting on April 15, 2010, the appellant made comments that largely mirrored the substance of his March 2010 email to the FBI, including a reference to state-sponsored terrorism.  While the substance of the appellant's comments at the staff meeting were not generally in dispute, there were conflicting accounts of the manner in which he made them.  One attendee described the appellant's comments as an "outburst," 1/14/14 HT at 162 (testimony of the GI section chief), while the appellant claimed they were made in a "passive informational tone," 1/13/14 HT at 205 (testimony of the appellant). Later the same day, the appellant's supervisor gave him a letter recommending that he contact the Employee Assistance Program (EAP) because of "deficiencies in your performance and/or conduct."  1/13/14 HT at 97 (testimony of the appellant); 0487W2 AF, Tab 106 at 20.  The date on the letter was April 13, 2010, 2 days before the staff meeting.  0487W2 AF, Tab 106 at 20.

¶10     On May 25, 2010, the appellant received a letter proposing to admonish him for disrespectful conduct during the April 15, 2010 staff meeting.  0487W2 AF, Tab 104 at 7-8.  The appellant filed a written response to the proposal, with attachments that included statements of support from coworkers.  0487W2 AF, Tab 105 at 5-26.  In a decision letter delivered to the appellant on July 12, 2010, the deciding official sustained the charge but mitigated the proposed admonishment to a written counseling.  *Id.* at 28-29.

¶11     The appellant testified that during the remainder of 2010 and early 2011, he received increasingly unfavorable work assignments.  1/13/14 HT at 127 (testimony of the appellant).  On September 15, 2011, the appellant's counsel sent a letter to agency counsel detailing what the appellant believed to be a pattern of intimidation and retaliation against him.  0487W2 AF, Tabs 102-03.

¶12     On October 31, 2011, the appellant had a conversation with a coworker (a staff nurse) near the beginning of his shift.  Although the exact words they used are in dispute, both testified that the staff nurse asked the appellant why he looked so upset, and the appellant replied that he had been having thoughts about

harming or killing his supervisor and that he would be taking leave starting the following day to seek medical care. 1/13/14 HT at 131-32 (testimony of the appellant); 1/16/14 HT at 75-76, 84-85 (testimony of the staff nurse).

¶13    The staff nurse did not immediately report the appellant's comments to management or law enforcement. She testified that she did not feel the appellant was an immediate threat, although she did feel "his emotions were getting out of control, and it needed to be addressed." 1/16/14 HT at 79 (testimony of the staff nurse). Within the hour, she asked a registered nurse whom she considered a mentor, whose opinion she sought in part because he was a veteran like the appellant, whether she should take the appellant's comment seriously and whether she should report it. *Id.* at 96. The registered nurse advised her to report the comment, although he agreed that it did not seem to represent an immediate threat. *Id.* at 97. About an hour later, she told a GI nurse that she was planning to report the comment but did not think she needed to do so immediately. *Id.* The GI nurse testified that she felt that anyone aware of the appellant's comments was obliged to report them, repeatedly urged the staff nurse to do so, and eventually, reported the comments herself. *Id.* at 117-18 (testimony of the GI nurse).

¶14    The supervisor learned of the appellant's comments from the GI nurse a few hours after the appellant spoke to the staff nurse. 1/16/14 HT at 169 (testimony of the supervisor). The supervisor's understanding was that the appellant told the staff nurse he had been thinking "a lot" about killing her.[5] The supervisor reported the matter to agency police. 0487W2 AF, Tab 106 at 30. As the appellant was leaving at the end of his regular shift that day, the supervisor gave the appellant an EAP letter.[6] 1/16/14 HT at 172 (testimony of the supervisor).

---

[5] The staff nurse does not recall the appellant saying he had been having those thoughts "a lot." 1/16/14 HT at 93 (testimony of the staff nurse).

[6] The supervisor was instructed by human resources to give EAP letters to not only the appellant, but also to the staff nurse, the registered nurse, and the GI nurse, the

She said he was not angry or disrespectful when she gave him the letter, and he did not make her feel unsafe. *Id.* at 224.

¶15    The appellant did not report to work the following day because he had approved leave. Effective November 1, 2011, the agency placed the appellant in a paid nonduty status pending an investigation into the events of the previous day. 0487W2 AF, Tab 105 at 57. The agency also barred the appellant from entering the grounds of the Albuquerque facility during his authorized absence, except as necessary to seek medical care or under other specified conditions. *Id.* The appellant learned of his status when he telephoned his supervisor on November 2, 2011. 1/13/14 HT at 138 (testimony of the appellant).

¶16    On November 22, 2011, the Director of the Albuquerque facility appointed three employees to an Administrative Investigative Board (AIB) to ascertain the veracity of reports that the appellant stated his intention to harm his supervisor. 0487W2 AF, Tab 131 at 1. The Director also asked the AIB "to report whether other such statements or related statements have been made that would potentially constitute a danger to employee safety." *Id.* The Director also instructed the AIB to address the following question: "Whether a nurse assigned to the GI clinic represents a danger to the safety of the GI clinic supervisor or other staff." *Id.* The AIB was not specifically directed to recommend what discipline, if any, the appellant should receive for his comments. January 15, 2014 HT (1/15/14 HT) at 189 (testimony of the AIB investigation chair).

¶17    During its investigation, the AIB reviewed a number of documents and interviewed 20 agency employees. 0487W2 AF, Tab 106 at 126. In its report dated March 19, 2012, the AIB made findings regarding the appellant's conversations on October 31, 2011, with the staff nurse and a separate conversation later the same morning with the registered nurse to whom the appellant allegedly stated that he had written the supervisor's name on fruit,

---

colleagues who were aware of the appellant's comments earlier that day. 1/16/14 HT at 172 (testimony of the supervisor).

which he then shot with a gun for target practice. *Id.* at 131. The AIB concluded, inter alia, that the appellant's statements to the staff nurse and the registered nurse on October 31, 2011, violated the agency's policy against "[b]ehavior that is hostile or of a volatile nature (e.g., verbal or physical aggression)." *Id.* at 134. The AIB found that, although it was not clear how credible a threat the appellant actually was to the supervisor, "[s]ignificant administrative action" was warranted for his comments. *Id.* at 136.[7]

¶18    On June 8, 2012, the agency proposed to remove the appellant based on the AIB's findings. 0487W2 AF, Tab 105 at 31. Specifically, the agency charged the appellant with "Inappropriate behavior causing disruption in the workplace" for his comments to the staff nurse about having thoughts of killing the supervisor. *Id.* The agency also charged the appellant with "Inappropriate behavior" for his comments to the registered nurse about writing the supervisor's name on fruit he used for target practice. *Id.*

¶19    The appellant, through counsel, responded to the proposed removal in writing on June 22, 2012. 0487W2 AF, Tab 105 at 72-121. On July 27, 2012, the appellant and his counsel met with the deciding official. During that meeting, the appellant informed the deciding official that he was going to retire. 1/13/14 HT at 146 (testimony of the appellant). The appellant retired effective July 31, 2012, before any final action was taken regarding his proposed removal. MSPB Docket No. DE-1221-12-0487-W-1, Appeal File (0487W1 AF), Tab 13 at 26.

¶20    The appellant filed a complaint with the Office of Special Counsel (OSC) alleging whistleblower reprisal in August 2010 (almost 2 years before his proposed removal). 0487W1 AF, Tab 21. He filed his first individual right of action (IRA) appeal, MSPB Docket No. DE-1221-12-0487-W-1, with the Board in

---

[7] The AIB faulted the agency for failing to respond more quickly to the appellant's comments and for having the supervisor approach the appellant alone to give him the EAP letter later the same day. 0487W2 AF, Tab 106 at 134-35. The AIB also concluded that agency managers in the GI section "may have contributed to the atmosphere of tension and distrust" in the section. *Id.* at 136.

August 2012 (about a month after he retired). 0487W1 AF, Tab 1. In his first IRA appeal, the appellant raised the April 2010 written reprimand, the May 2010 letter of admonishment, and the June 2012 proposed removal as alleged retaliatory personnel actions. 0487W2 AF, Tab 23 at 5. The appellant also alleged in his first IRA appeal that his retirement was involuntary, although it did not appear that he had exhausted that alleged personnel action before OSC prior to filing the first IRA appeal. 0487W1 AF, Tab 28 at 2. In November 2012, the appellant filed a second IRA appeal, MSPB Docket No. DE-1221-13-0087-W-1, in which he again alleged that his retirement was involuntary. MSPB Docket No. DE-1221-13-0087-W-1, Appeal File (0087W1 AF), Tab 1. He filed a second OSC complaint on November 25, 2012, in which he specifically raised his alleged involuntary retirement and the access restrictions. 0487W1 AF, Tab 23 at 37. Because the appellant's second OSC complaint was pending, the administrative judge dismissed the second IRA appeal without prejudice to refiling. 0087W1 AF, Tab 9, Initial Decision. The administrative judge simultaneously dismissed the first IRA appeal without prejudice so that both appeals could be heard together. 0487W1 AF, Tab 28, Initial Decision. After both appeals were timely refiled, the administrative judge joined the two IRA appeals. 0487W2 AF, Tab 23.[8]

¶21    After holding a hearing, the administrative judge issued an initial decision denying the appellant's request for corrective action. 0487W2 AF, Tab 133,

---

[8] The Board's field office also docketed a chapter 75 appeal, MSPB Docket No. DE-0752-14-0122-I-1, to address the appellant's involuntary retirement claim. However, it is undisputed that the appellant was appointed to his position under 38 U.S.C. § 7401(1), and that he therefore does not have chapter 75 Board appeal rights. Accordingly, the administrative judge dismissed the chapter 75 appeal for lack of jurisdiction. 0487W2 AF, Tab 51. The appellant does not challenge that dismissal on petition for review. The Clerk of the Board initially docketed a petition for review regarding the chapter 75 appeal. However, the Clerk subsequently informed the parties that it was administrative error to docket a petition for review in the chapter 75 appeal, and that it was therefore rescinding the docketing of a petition for review in MSPB Docket No. DE-0752-14-0122-I-1. Petition for Review (PFR) File, Tab 3.

Initial Decision (ID). The administrative judge found that the appellant made protected disclosures that were a contributing factor in (1) the April 2010 written counseling for leaving his computer unattended, (2) the May 2010 proposed admonishment—later mitigated to a written counseling—for his behavior at the April 15, 2010 staff meeting, and (3) his proposed removal. ID at 16-22. The administrative judge found, however, that the appellant failed to establish that his retirement was involuntary and therefore did not constitute a personnel action. ID at 19-21.[9] Finally, the administrative judge found that the agency proved by clear and convincing evidence that it would have issued the written counselings and the proposed removal in the absence of the appellant's disclosures. ID at 22-29.

¶22 The appellant has filed a timely petition for review of the initial decision. Petition for Review (PFR) File, Tab 1. The appellant challenges the administrative judge's findings and credibility determinations in connection with the proposed removal. *Id.* at 9-26. He also argues that his retirement was involuntary at least in part because the agency denied him due process. *Id.* at 26-27. The agency has not responded to the petition for review.

## DISCUSSION OF ARGUMENTS ON REVIEW

¶23 On petition for review, the appellant does not specifically challenge the administrative judge's findings regarding the written counselings or the restrictions on entering the Albuquerque facility. We have reviewed those

---

[9] The appellant also had claimed as personnel actions (1) the restrictions placed on his access to the Albuquerque facility, and (2) a series of nonselections. The administrative judge found that the access restrictions were subsumed by the appellant's placement on administrative leave (which he did not challenge before the Board) for the period prior to his retirement, and that, to the extent they remained in effect after the appellant's retirement, they no longer constituted personnel actions. ID at 19. The appellant withdrew his claim regarding the nonselections during the hearing. 1/13/14 HT at 210-11 (testimony of the appellant). On petition for review, the appellant does not challenge the administrative judge's resolution of the access restrictions or nonselections, and we see no reason to disturb them.

findings, and we find no basis to disturb them.[10] For the reasons set forth below, however, we find that this appeal should be remanded for further consideration regarding the proposed removal and the alleged involuntary retirement.

<u>Further adjudication is required concerning the appellant's claim that the agency proposed his removal in reprisal for his protected disclosures.</u>

¶24 As our reviewing court has held, in determining whether the agency proved by clear and convincing evidence that it would have taken the same actions against the appellant, even absent any protected disclosures, the Board should consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of agency officials involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999); *Schnell v. Department of the Army*, 114 M.S.P.R. 83, ¶ 23 (2010).[11] Our reviewing court has stated that "[e]vidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion." *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012). The court in *Whitmore* further stated that "[i]t is error for the [Board] to not evaluate all the pertinent evidence in determining whether an element of a claim or defense has been proven adequately." *Id.* Building on this directive from the court in *Whitmore*, the Board has held that a proper analysis of the clear and convincing evidence issue requires that all of the evidence be weighed together—both the evidence that

---

[10] Similarly, although the agency has not filed a cross petition for review, we have reviewed the administrative judge's finding that the appellant established a prima facie case of whistleblower reprisal, and we see no reason to disturb that finding.

[11] We have reviewed the relevant legislation enacted during the pendency of this appeal and have concluded that it does not affect the outcome of the appeal, nor does it affect the relevant holdings in the authorities cited herein.

supports the agency's case and the evidence that detracts from it. *Shibuya v. Department of Agriculture*, [119 M.S.P.R. 537](), ¶ 37 (2013) (citing *Whitmore*, 680 F.3d at 1368).

¶25    In assessing the strength of the agency's evidence in support of the proposed removal, the administrative judge cited the AIB, witness statements provided to police, and the fact that the supervisor obtained a restraining order against the appellant. ID at 23. He also found that, because the agency did not specifically charge the appellant with making a threat against the supervisor, it did not need to prove that the appellant actually intended to threaten harm against her. *Id.* The administrative judge dismissed as "not material" an assessment performed by an agency psychiatrist 2 days after the October 31, 2011 comments. ID at 24. In that assessment, the agency psychiatrist opined in part that the appellant "currently poses low risk of acting on his earlier stated [homicidal ideation]," 0487W2 AF, Tab 60 at 63, but that "[t]his could change rapidly should events change in a way to endanger his long term insurance/work at the [agency]," *id.* The administrative judge also dismissed as "not material" the fact that the agency allowed the appellant to work his entire shift and had the supervisor interact directly with him on the day he made the comments. ID at 24-25.

¶26    On review, the appellant argues that the administrative judge failed to acknowledge the distinction between present threats of violence and past thoughts of violence. PFR File, Tab 1 at 10-13. He also argues that it was not his statements themselves, but rather their embellished retelling by others, that caused any disruption in the workplace. *Id.* at 13-15.

¶27    We find that the administrative judge's assessment of the first *Carr* factor in connection with the proposed removal requires further analysis in order to comply with *Whitmore*. In particular, the administrative judge should acknowledge and weigh those factors that detract from the strength of the agency's evidence, including those set forth below.

¶28     The proposing official testified that he did not read the AIB report or the supporting evidence before proposing the appellant's removal, and that the Chief of Staff gave him an oral summary of the AIB's recommendation, which he recalled to be "that [the appellant] posed a threat to a coworker and supervisor." 1/14/14 HT at 43-44 (testimony of the proposing official). He testified at one point that he could not remember whether the Chief of Staff informed him that the AIB had recommended the appellant's termination, *id.* at 47, but he later testified that he "agreed with this recommendation to terminate," *id.* at 126. Under questioning from the administrative judge, the proposing official testified that the Chief of Staff informed him that the AIB had recommended "significant administrative action" be taken in response to the appellant's statements about harming the supervisor, and he interpreted that phrase to mean termination.[12] *Id.* at 148. In explaining his decision to propose the appellant's removal, the proposing official described the appellant's actions as "making a threat at the workplace to kill a coworker." *Id.* at 127. He testified that there are really no options besides termination "[w]hen someone threatens to kill another person at work." *Id.* at 150. He was not aware of an agency doctor's assessment 2 days after the incident stating that the appellant posed a low risk of acting on his thoughts. *Id.* at 47. The proposing official also testified that he did not consider any mitigating factors or any alternatives to removal before writing the proposal. *Id.* at 47-48.

¶29     It appears that in proposing the removal, the proposing official relied almost entirely upon the AIB's recommendation that "significant administrative action" be taken against the appellant. While there is nothing inherently improper about relying on such a recommendation, the fact that the proposing official proposed a removal without reviewing the underlying evidence weighs against the agency in

---

[12] The Chief of Staff testified that she also did not read the AIB report or the supporting evidence, and that her understanding of the AIB's findings came from her discussions with the Director. 1/14/14 HT at 366-67, 370 (testimony of the Chief of Staff).

analyzing the first *Carr* factor. *See Shibuya*, [119 M.S.P.R. 537](), ¶ 33 (citing the proposing official's failure to review the evidentiary package supporting a proposed action as a factor weighing against the agency in analyzing the first *Carr* factor). The administrative judge should consider this fact in analyzing the first *Carr* factor on remand.

¶30    The appellant cites *Caronia v. Department of Justice*, [78 M.S.P.R. 201]() (1998), *overruled on other grounds by Carter v. Department of Justice*, [88 M.S.P.R. 641](), ¶ 25 n.5 (2001), and *Brott v. General Services Administration*, [116 M.S.P.R. 410](), ¶ 13 n.* (2011), in support of his argument that the agency's evidence in support of the proposed removal was weak. PFR File, Tab 1 at 11-12. The appellant in *Caronia* was on leave from work when he informed coworkers who inquired about his health that, before he went on leave, he had thoughts of killing his supervisor. *Caronia*, 78 M.S.P.R. at 205. The agency removed the appellant based on charges including a charge of conduct unbecoming a law enforcement officer based on his comments to his coworkers while he was on leave. *Id.* at 206. The agency did not specifically charge the appellant in that case with making a threat. *Id.* at 206 n.1. In holding that the agency did not prove the conduct unbecoming charge, the Board in *Caronia* noted that the appellant's comments did not appear to cause anxiety and disruption for the coworkers who heard them directly. *Id.* at 208. Rather, those coworkers understood the appellant's comments to be about thoughts he had had in the past for which he had successfully sought treatment. *Id.* Those coworkers did not understand the appellant's comments to be a serious threat against his supervisor. *Id.* The Board found that any disruption and anxiety in the workplace occurred only after the appellant's comments were relayed to another coworker, who then embellished them in such a way that the appellant's supervisor understood them to be an actual threat. *Id.* at 208-09.

¶31    There are distinctions between the present case and *Caronia*. For example, the appellant in *Caronia* was already on leave at the time of his comments and

already had sought treatment for the thoughts he expressed to his coworkers, whereas here the appellant was still in the workplace when he made his comments. Additionally, the statements made in *Caronia* were found to refer to that appellant's thoughts in the past, whereas here it is not clear whether the appellant was still having thoughts about harming or killing the supervisor when he made his comments. Nevertheless, we find that the parallels between *Caronia* and the present case are sufficient to merit further consideration in assessing the strength of the agency's evidence in support of the proposed removal. In assessing the applicability of *Caronia* to the facts of the present case, the administrative judge may need to make additional findings and credibility determinations regarding the appellant's comments, the effects those comments had on those to whom they were made,[13] and the extent to which those comments may have been embellished by those who did not hear them directly.

¶32    Regarding the second *Carr* factor, the existence and strength of any motive to retaliate, the administrative judge found that, although the appellant's disclosures did not result in formal adverse consequences for any of the management officials involved in the decision to propose his removal, those officials were aware of, and resented, the appellant's disclosures. ID at 25-27. The administrative judge therefore found that those officials had a motive to retaliate against the appellant, although he described that motive as "not as strong as the appellant suggests." *Id.* On review, the appellant argues that the administrative judge failed to consider additional evidence bearing on the strength of the motive to retaliate. PFR File, Tab 1 at 16-17. We find nothing in the administrative judge's analysis of the second *Carr* factor that itself would

---

[13] The registered nurse, the individual to whom the appellant commented about putting his supervisor's name on a fruit, was approved as a witness but was withdrawn by the agency at the hearing. 1/15/14 HT at 177 (statement of agency counsel). A different employee who reported the comment about the fruit also testified that he did not think the appellant would ever harm the supervisor. 1/14/14 HT at 223 (testimony of the health technician).

require remand. Nevertheless, because we are remanding the appeal for further consideration of the other *Carr* factors, the administrative judge also may supplement his analysis of the second *Carr* factor on remand to address the appellant's objections, should he choose to do so.

¶33    Regarding the third *Carr* factor—evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated—the administrative judge found that "[t]he agency has removed employees who made threats to kill others." ID at 28. He acknowledged that the evidence showed the agency's enforcement of its "zero tolerance" policy on workplace violence was "uneven," but found that the agency had consistently removed employees who had threatened to kill another employee. ID at 29. On petition for review, the appellant argues that the comparators cited by the administrative judge were not similarly situated to him because of the nature of their misconduct and other factors. PFR File, Tab 1 at 18-21.

¶34    To the extent the appellant argues that the cited comparators are not similarly situated because the agency used different labels in charging them, *see id.* at 18-19, his argument is misplaced. *See Aquino v. Department of Homeland Security*, 121 M.S.P.R. 35, ¶ 30 (2014) (rejecting an agency's assertion that the third *Carr* factor rests solely on a comparison of the charges' labels of misconduct). The court in *Whitmore* warned that the "importance and utility [of the third *Carr* factor] should not be marginalized by reading it so narrowly as to eliminate it as a helpful analytical tool." *Whitmore,* 680 F.3d at 1374. Thus, the administrative judge properly considered the agency's proffered comparators in assessing the third *Carr* factor. However, putting aside the labels assigned to their respective conduct, the appellant correctly notes that there are differences in the nature of the conduct alleged against him and that of the cited comparators. Specifically, one of the cited comparators was charged with telling coworkers, inter alia, "I will shoot everybody if I need to and I will blame it on" Post Traumatic Stress Disorder. 0487W2 AF, Tab 85 at 23. That comparator also was

charged with disrespectful language toward coworkers and disrespectful comments of a sexual nature. *Id.* at 23-24. The second cited comparator was charged with making multiple statements in reference to his plan to kill a particular veteran patient, including telling his supervisor that he had brought a weapon to work on a day when he knew the veteran patient in question had an appointment. 0487W2 AF, Tab 86 at 61. Thus, the cited comparators' conduct appears to have involved more direct threats of violence against coworkers or patients than the comments the appellant made in the present case. Rather than acknowledging the differences between the appellant's conduct and that of the cited comparators, the administrative judge simply grouped them all together under the category of "threats to kill others." ID at 28. We find that *Whitmore* requires a more nuanced view of the evidence. On remand, the administrative judge should consider the differences between the appellant and the cited comparators, and determine whether, and to what extent, those differences affect the weight to be given to the comparator evidence.

¶35     Next, we find that the relevant evidence regarding the proposed removal must be re-weighed as a whole. We further find that the administrative judge is in the best position to do so because he is the one who heard the live testimony and made credibility determinations.[14] *See Shibuya*, [119 M.S.P.R. 537], ¶ 37. In conducting his analysis, the administrative judge should be mindful of the court's decision in *Whitmore*, 680 F.3d at 1368-72, and consider all the relevant evidence as a whole, including the evidence discussed above, *supra* ¶¶ 28-34, as well as

---

[14] The appellant argues on review that the administrative judge's ability to make credibility determinations was impaired due to the passage of more than 2 years between the hearing dates and the issuance of the initial decision. PFR File, Tab 1 at 25. We see no reason to discount the administrative judge's credibility determinations on that basis alone. The administrative judge may have made his credibility determinations during or shortly after the hearing. Even if he did not do so, the administrative judge is still in a better position to make those determinations than the Board members, who did not have the opportunity to observe the witnesses. Because we are remanding the appeal, we need not address the appellant's other challenges regarding credibility determinations at this stage.

any other evidence he finds relevant. *See Shibuya*, [119 M.S.P.R. 537](), ¶ 37. Because the clear and convincing evidence determination may require the administrative judge to make additional credibility and factual determinations, we leave it to the administrative judge to determine in the first instance whether to reconvene the hearing to take more testimony on this issue.

¶36     Our decision to remand this appeal should not be read as excusing or minimizing the appellant's conduct that gave rise to his proposed removal. The comments attributed to the appellant are completely inappropriate and deserving of significant disciplinary action. Nor should our decision to remand this appeal be read as a suggestion that the appellant should ultimately prevail in this appeal. We are remanding the appeal to the administrative judge because further legal analysis is required, not because we believe the outcome of the appeal should necessarily change.

### The administrative judge should reconsider the appellant's involuntary retirement claim in light of his findings concerning the proposed removal.

¶37     The administrative judge found that the appellant failed to prove that his retirement was involuntary. ID at 19-20. In doing so, the administrative judge found that the appellant (1) was not coerced into retiring by intolerable working conditions, and (2) did not retire after the agency threatened a removal action it knew or should have known could not be substantiated. ID at 20. Although we agree with the administrative judge's analysis of the involuntary retirement claim, we nevertheless remand that claim for possible reconsideration in light of the administrative judge's findings on remand regarding the proposed removal.

¶38     An employee-initiated action, such as a retirement, is presumed to be voluntary and therefore outside the Board's jurisdiction. *Vitale v. Department of Veterans Affairs*, [107 M.S.P.R. 501](), ¶ 17 (2007). An involuntary retirement is tantamount to a removal, however, and it therefore is subject to the Board's jurisdiction. *Id.* "[A]ll constructive adverse action claims . . . have two things in common: (1) the employee lacked a meaningful choice in the matter; and (2) it

was the agency's wrongful actions that deprived the employee of that choice." *Bean v. U.S. Postal Service*, [120 M.S.P.R. 397](), ¶ 8 (2013).

¶39 Intolerable working conditions may render an action involuntary if the employee demonstrates that the agency engaged in a course of action that made working conditions so difficult or unpleasant that a reasonable person in his position would have felt compelled to retire. *Vitale*, [107 M.S.P.R. 501](), ¶ 20. We agree with the administrative judge that the appellant failed to establish that his working conditions were intolerable. In addition, because the appellant was on administrative leave for approximately 9 months before he retired, his working conditions are not particularly relevant to the voluntariness of his retirement. *See Axsom v. Department of Veterans Affairs*, [110 M.S.P.R. 605](), ¶ 16 (2009) (finding that alleged incidents of harassment figured only tangentially into an appellant's decision to resign, if at all, when they preceded the decision to resign by several months). Rather, the key factor in the appellant's decision to retire was the proposal to remove him, which came less than 2 months prior to his retirement.

¶40 To prove that a retirement in the face of a proposed adverse action was involuntary, the appellant must show that the agency knew or should have known that the action could not be substantiated, *Schultz v. U.S. Navy*, [810 F.2d 1133](), 1136-37 (Fed. Cir. 1987); *Barthel v. Department of the Army*, [38 M.S.P.R. 245](), 251 (1988), or that the agency lacked an arguable basis for the proposed action, *see Garland v. Department of the Air Force*, [44 M.S.P.R. 537](), 540 (1990). While we recognize that there may be some weaknesses in the agency's case for removing the appellant, *see supra* ¶¶ 28-31, we find that the appellant failed to establish that the agency knew or should have known that its proposed removal could not be substantiated or that the agency lacked an arguable basis for removing the appellant in light of his comments.[15]

---

[15] The appellant argues that his primary reason for retiring was the agency's failure to provide him with the full AIB investigative file, and that the agency's failure to provide that full file constituted denying him due process. PFR File, Tab 1 at 26-27. Pursuant

¶41    Nevertheless, further adjudication of the involuntary retirement claim may be required on remand. Allegations of reprisal for whistleblowing, when made in an IRA appeal in support of an assertion that an agency coerced an appellant's resignation or retirement, should be considered for the limited purpose of determining whether they support a finding of coercion. *Heining v. General Services Administration*, 61 M.S.P.R. 539, 551 (1994); *Burke v. Department of the Treasury*, 53 M.S.P.R. 434, 439 (1992). If the administrative judge determines on remand that the agency failed to meet its burden by clear and convincing evidence regarding the proposed removal, and that the proposed removal was therefore retaliatory, he then should reconsider the voluntariness of the appellant's retirement in light of that finding. *See Diefenderfer v. Department of Transportation*, 108 M.S.P.R. 651, ¶ 37 (2008) (remanding an IRA appeal for further consideration of an alleged involuntary resignation when that claim was intertwined with other claims that were being remanded).

## The administrative judge's discovery rulings did not constitute an abuse of discretion.

¶42    The appellant argues that the administrative judge erred in denying his motion to compel documents and testimony relating to the VISN investigation. PFR File, Tab 1 at 25-26. The administrative judge found that the agency properly withheld the documents as privileged under 38 U.S.C. § 5705, which prohibits disclosure of agency records and documents "created . . . as part of a medical quality-assurance program." 38 U.S.C. § 5705(a). 0487W2 AF, Tab 52

---

to the U.S. Court of Appeals for the Federal Circuit's decisions in *Ward v. U.S. Postal Service*, 634 F.3d 1274, 1279-80 (Fed. Cir. 2011), and *Stone v. Federal Deposit Insurance Corporation*, 179 F.3d 1368, 1376-77 (Fed. Cir. 1999), a deciding official violates an employee's due process rights when he relies upon new and material ex parte information as a basis for his decisions on the merits of a proposed charge or the penalty to be imposed. *See Norris v. Securities & Exchange Commission*, 675 F.3d 1349, 1354 (Fed. Cir. 2012). Absent a final decision on the proposed removal, we are unable to find a due process violation because we do not know what information the deciding official would have relied upon had he or she been given the opportunity to render a final decision.

at 2-3. The administrative judge also denied the appellant's request to depose VISN officials, finding that, although the statutory privilege applies only to "records and documents," allowing the depositions would be contrary to the public policy concerns that led to the creation of the privilege. *Id.* at 3. The appellant sought reconsideration of the administrative judge's ruling denying his motion to compel, arguing that the documents in question do not fall under the statutory privilege. 0487W2 AF, Tab 54. The administrative judge denied the appellant's motion for reconsideration, finding that the appellant was aware when he filed his motion to compel that the agency was asserting the statutory privilege as the basis for not producing the requested materials and that he therefore should have addressed the privilege issue in his initial motion. 0487W2 AF, Tab 111.

¶43       Under 5 C.F.R. § 1201.41(b)(4), an administrative judge has broad discretion in ruling on discovery matters and, absent an abuse of discretion, the Board will not find reversible error in such rulings. *Wagner v. Environmental Protection Agency*, 54 M.S.P.R. 447, 452 (1992), *aff'd*, 996 F.2d 1236 (Fed. Cir. 1993) (Table). The Board will not find reversible error in an administrative judge's discovery rulings absent an abuse of discretion that prejudiced the appellant's substantive rights. *See Jones v. Department of Health and Human Services*, 119 M.S.P.R. 355, ¶ 18, *aff'd*, 544 F. App'x 976 (Fed. Cir. 2013).

¶44       We find that the administrative judge acted within his discretion in denying both the appellant's motion to compel and his motion to reconsider. Based on the submissions before him when he ruled on the motion, the administrative judge properly determined that the documents in question were subject to the statutory privilege and could therefore not be produced before the Board. Although the appellant acknowledged in his motion to compel that the agency had invoked the privilege, he did not address the applicability of the privilege in his argument in support of the motion. 0487W2 AF, Tab 43. Given the appellant's failure to raise arguments regarding the privilege issue in his motion to compel, we find that the administrative judge acted properly within his discretion in denying the

appellant an opportunity to raise those arguments for the first time on reconsideration.

¶45 The appellant also asked the administrative judge to draw an adverse inference against the agency as to the contents of the documents withheld pursuant to a claim of privilege. The administrative judge denied that request, finding that the agency properly withheld those documents as privileged and therefore the sanction of an adverse inference was not warranted. ID at 25 n.17. We agree with the administrative judge and find no abuse of discretion in his failure to draw an adverse inference.[16]

### ORDER

¶46 For the reasons discussed above, we remand this case to the field office for further adjudication in accordance with this Remand Order.[17]

FOR THE BOARD:

/s/ for
_____
Jennifer Everling
Acting Clerk of the Board

Washington, D.C.

---

[16] The primary remaining issue in this case is whether the agency proved by clear and convincing evidence that it would have proposed the appellant's removal absent his disclosures. The documents in question may have assisted the agency in meeting that burden, and therefore the absence of those documents from the record due to a statutory privilege actually may disadvantage the agency.

[17] The administrative judge should incorporate in the remand initial decision any of his earlier findings that have not been disturbed by the Board.

DISSENTING OPINION OF TRISTAN L. LEAVITT

in

*Anthony J. Daquino v. Department of Veterans Affairs*

MSPB Docket Nos. DE-1221-12-0487-W-2, DE-1221-13-0087-W-2

¶1    For the reasons set forth below, I respectfully dissent from the majority opinion in this case.

¶2    The majority makes the following findings of fact, which I discern no reason to disturb. On October 31, 2011, the appellant told a coworker "that he had been having thoughts about harming or killing his supervisor and that he would be taking leave starting the following day to seek medical care." Remand Order (RO), ¶ 12. An Administrative Investigation Board (AIB) was convened in November 2011. *Id.*, ¶ 16. The AIB found the appellant made the aforementioned statement and had also told a different coworker that "he had written the supervisor's name on fruit, which he then shot with a gun for target practice." *Id.*, ¶ 17. The AIB concluded the appellant's comments to his coworkers violated agency policy and warranted significant administrative action. *Id.* The agency proposed the appellant's removal based on two charges of Inappropriate Behavior—one for his comments to the staff nurse about having thoughts of killing his supervisor[1] and one for his comments to the other coworker about writing his supervisor's name on fruit he then used for target practice. *Id.*, ¶ 18. The appellant subsequently retired and, in his appeals, he alleged the proposed removal and his involuntary retirement were retaliatory based on protected whistleblowing activity. *Id.*, ¶¶ 18-20.

¶3    The majority finds the administrative judge's assessment of the first *Carr* factor in connection with the proposed removal requires further analysis because

---

[1] The agency asserted this inappropriate behavior caused disruption in the workplace.

the proposing official proposed a removal without reviewing the underlying evidence, instead relying on an oral summary of the AIB's recommendation, including that the AIB concluded the appellant posed a threat to other employees and recommended significant administrative action. *Id.*, ¶¶ 27-29. The majority also discusses in detail *Caronia v. Department of Justice*, 78 M.S.P.R. 201 (1998), *overruled on other grounds by Carter v. Department of Justice*, 88 M.S.P.R. 641, ¶ 25 n.5 (June 25, 2001), and *by Brott v. General Services Administration*, 116 M.S.P.R. 410 (2011), and remands the appeal for the administrative judge to assess *Caronia*'s applicability "to the facts of the present case" and potentially make "additional findings and credibility determinations regarding the appellant's comments, the effects those comments had on those to whom they were made, and the extent to which those comments may have been embellished by those who did not hear them directly."[2] RO, ¶¶ 30-31.

¶4        In my view, *Caronia* is inapplicable in the instant individual right of action (IRA) appeal because it involved a removal action taken under chapter 75. Unlike in chapter 75 appeals, the Board lacks the authority in an IRA appeal to adjudicate the merits of the underlying personnel action; rather, the Board's jurisdiction is limited to adjudicating the whistleblower allegations. *Lu v. Department of Homeland Security*, 122 M.S.P.R. 335, ¶ 7 (2015); *see also* 5 C.F.R. § 1209.2(c) (in an IRA appeal that concerns an adverse action under chapter 75, "the agency need not prove its charges"). The agency must show by clear and convincing evidence that it would have taken the personnel action(s) even absent the appellant's protected activity, which differs from other Board

---

[2] In his petition for review, the appellant cited *Caronia* in support of his assertions that: (1) the agency "did not meet its burden of proof that Appellant had made a threat;" (2) the alleged threat needs to be analyzed with regard to whether the thoughts were present or past thoughts; and (3) the administrative judge should have analyzed whether the appellant's comments "were the actual cause of the disruption in the workplace or whether the disruption was the result of embellishments on the Appellant's comments by other coworkers and managers." Petition for Review File, Tab 1 at 9-15.

proceedings where agencies must prove the merits of their actions by preponderant evidence. *Marren v. Department of Justice*, 51 M.S.P.R. 632, 641 (1991), *aff'd*, 980 F.2d 745 (Fed. Cir. 1992) (Table), and *modified on other grounds by Robinson v. U.S. Postal Service*, 63 M.S.P.R. 307, 323 n.13 (1994).

¶5        The *Carr* factors are not discrete elements which the agency must prove by clear and convincing evidence. *See Phillips v. Department of Transportation*, 113 M.S.P.R. 73, ¶ 15 (2010). While the existence or lack of evidence supporting a charge is relevant to the agency's overall burden on the clear and convincing evidence issue, the Board does not review the reasonableness of the penalty as it would in a chapter 75 appeal. *Aquino v. Department of Homeland Security*, 121 M.S.P.R. 35, ¶ 29 (2014); *Shibuya v. Department of Agriculture*, 119 M.S.P.R. 537, ¶ 36 (2013); *Weaver v. Department of Agriculture*, 55 M.S.P.R. 569, 575 (1992) (the appropriateness of the penalty imposed is not at issue in an IRA appeal); 5 C.F.R. § 1209.2(c) ("the Board may consider the strength of the agency's evidence in support of its adverse action in determining whether the agency has demonstrated by clear and convincing evidence that it would have taken the same personnel action in the absence of the whistleblowing or other protected activity"). "[T]he relevant inquiry is not whether the appellant committed any actual misconduct, but whether the agency had strong evidence in support of its personnel action." *Phillips*, 113 M.S.P.R. 73, ¶ 15. Thus, even where an appellant is later found not to have engaged in misconduct as charged, the agency may nonetheless have had a legitimate basis for imposing a penalty at the time it acted. *See id.*; *cf. Redschlag v. Department of the Army*, 89 M.S.P.R. 589, ¶ 69 (2001) ("the proper perspective when weighing the gravity of the misconduct against the motive to retaliate is to view the gravity of the misconduct as it appeared to the deciding official at the time he took the removal action").

¶6        The fact that the proposing official only relied on an oral summary of the AIB investigation, without reviewing the actual report himself, is not sufficient to

find the agency did not have strong reasons for its action.[3] Notably, the information the proposing official received and relied on appears largely consistent with what is contained in the AIB report. The AIB investigation noted the appellant admitted he "fantasized about killing" his supervisor, which he disclosed to both his coworker and a police officer. MSPB Docket No. DE-1221-12-0487-W-2, Appeal File, Tab 106 at 134. The AIB concluded:

> Mr. Daquino has violated a basic tenet of professional conduct by verbalizing such physically threatening statements towards his nurse manager . . . returning Mr. Daquino to GI would not be in the best interests of the staff or patients of this clinical area. While it is unclear how credibly dangerous Mr. Daquino might be towards his manager, the fact is that no level of threat is to be tolerated and must be assumed to be actionable. Significant administrative action is warranted.

*Id.* at 137. I would find the agency has presented strong evidence supporting its decision to propose the appellant's removal for inappropriate behavior. I believe the appellant's conduct, which is not substantially in dispute, was objectively inappropriate, as charged, regardless of any mitigating factors or the presence or absence of an actual threat.

¶7    Regarding the third *Carr* factor, the majority suggests that the administrative judge did not properly assess whether proffered comparators were similarly situated to the appellant. RO, ¶¶ 33-34. The majority remands for the administrative judge to "consider the differences between the appellant and the cited comparators, and determine whether, and to what extent, those differences affect the weight to be given to the comparator evidence." *Id.* In this case, the relevant question is whether the agency presented any evidence that it proposed

---

[3] Indeed, in *Shibuya*, 119 M.S.P.R. 537, ¶ 33, which the majority cites, the proposing official's failure to review the evidentiary package was just one of many factors supporting a finding that the agency failed to meet its clear and convincing burden. For instance, the proposing official also failed to order a customary case analysis and the deciding official lacked understanding of the evidence supporting the demotion at issue. *Id.*

removal against similarly situated employees who did not engage in protected activity. I see no error in the administrative judge's "group[ing]" the proffered comparators "all together under the category of 'threats to kill others,'" as it relates to proposed discipline. *See id.*, ¶ 34. The agency's charges are based on the appellant's statements concerning killing his supervisor, which I would find sufficiently similar to the proffered comparators for purposes of finding the agency has shown it has proposed removal in cases of similarly situated non-whistleblowers.[4]

¶8    The majority also "agree[s] with the administrative judge's analysis of the involuntary retirement claim" and his finding "that the appellant failed to establish that his working conditions were intolerable," ultimately concluding "the appellant failed to establish that the agency knew or should have known that its proposed removal could not be substantiated or that the agency lacked an arguable basis for removing the appellant in light of his comments." RO, ¶¶ 37-40. I agree with the majority in this regard.

¶9    The majority goes on to remand the appellant's involuntary retirement claim so that the administrative judge may reconsider the voluntariness of the appellant's retirement in the event he finds, on remand, that the proposed removal was retaliatory. *Id.*, ¶ 41. For the reasons previously stated, I do not agree with remanding this appeal and would instead affirm the initial decision. However, as the appeal is being remanded, I note that I would not require, on remand, additional analysis concerning the appellant's involuntary retirement claim. The mere allegation that one was retaliated against for whistleblower activities is insufficient to demonstrate that working conditions were made so intolerable by the alleged retaliation as to render a retirement involuntary by reason of coercion.

---

[4] To the extent that none of the proffered comparators are similarly situated, given the agency's strong evidence in support of proposing removal—namely, the appellant's undisputed, objectively inappropriate comments—I would alternatively find the third *Carr* factor neutral and that the agency met its overall clear and convincing burden.

*See Burke v. Department of the Treasury*, 53 M.S.P.R. 434, 439 (1992). Evidence of retaliation goes to the ultimate question of coercion—whether under all of the circumstances working conditions were made so difficult by the agency that a reasonable person in the employee's position would have felt compelled to retire. *See Markon v. Department of State*, 71 M.S.P.R. 574, 577-80 (1996) (the fact that the appellant made a prima facie case of age discrimination was not "in-and-of-itself" relevant to the appellant's burden of proof on the voluntariness issue); *see also Axsom v. Department of Veterans Affairs*, 110 M.S.P.R. 605, ¶ 16 (2009) (considering how the appellant's claims of harassment, retaliation, and discrimination figured into his decision to resign, including that he "had the option to stand and fight the alleged discrimination, harassment, and retaliation rather than resign"). Accordingly, a finding that the proposed removal was retaliatory would not require revising the aforementioned bases for finding the agency did not coerce the appellant to retire.


/s/
_____
Tristan L. Leavitt
Member